[Cite as *In re A.C.*, 2018-Ohio-386.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105347**

# IN RE: A.C., ET AL.
# Minor Children

[Appeal by L.C., Mother ]

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD13908673, AD13908674, AD13908675,
and AD14911228

**BEFORE:** Jones, J., E.A. Gallagher, A.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** February 1, 2018

**ATTORNEY FOR APPELLANT**

Jonathan N. Garver
The Brownhoist Building
4403 St. Clair Avenue
Cleveland, Ohio 44103


**ATTORNEYS FOR APPELLEE**S

**For CCDCFS**

Michael C. O'Malley
Cuyahoga County Prosecutor

BY: Anthony R. Beery
Assistant County Prosecutor
4261 Fulton Parkway
Cleveland, Ohio 44144

BY:   Cheryl Rice
Assistant County Prosecutor
8111 Quincy Avenue, Room 440
Cleveland, Ohio 44104

**For P.B. (Father)**

Jeffrey Froude
P.O. Box 771112
Lakewood, Ohio 44107

Timothy A. Spurrier
W.H. Hunt Legal Group L.L.C.
24500 Center Ridge Road, Suite 170
Westlake, Ohio 44145

**Guardian ad litem for P.B.**

Paul Berman
24105 Duffield Road
Shaker Heights, Ohio 44122

**For J.S. (Father)**

Britta M. Barthol
P.O. Box 670218
Northfield, Ohio 44067

Daniel J. Bartos
Bartos & Bartos, L.P.A.
20220 Center Ridge Road, Suite 160
Rocky River, Ohio 44116

**Guardian ad litem for J.S.**

Suzanne F. Jucaitis
P.O. Box 771661
Lakewood, Ohio 44107

**For A.C.**

John M. Stryker
Stryker Law, Co., Ltd.
20006 Detroit Road, Suite 310
Rocky River, Ohio 44116

**For T.H. (Maternal Grandmother)**

Theodore Amata
12107 Mayfield Road, Suite 202
Cleveland, Ohio 44106

**Guardian ad litem**

Carla L. Golubovic
P.O. Box 29127
Parma, Ohio 44129

Jonathan Z. Wilbur
13940 Cedar Road, Suite 246
Cleveland, Ohio 44118

LARRY A. JONES, SR., J.:

**{¶1}** Appellant, Mother, appeals the trial court's ruling granting permanent custody of her four children to the Cuyahoga County Department of Children and Family Services ("CCDCFS" or "the agency"). For the reasons that follow, we affirm.

**{¶2}** In 2013, CCDCFS filed a complaint alleging that three of Mother's children, B.B., C.C., and A.C. were dependent, A.C. was abused, and requesting permanent custody. The children were not in Mother's custody at this time, having previously been adjudicated dependent in 2011. They were in a maternal aunt's custody, but the aunt could no longer care for the children. The maternal grandmother moved to intervene in the case, which the trial court granted.

**{¶3}** In 2014, the trial court granted permanent custody of the children to CCDCFS, but this court reversed the decision, finding that the juvenile court failed to comply with Juv.R. 29 when accepting B.B.'s, C.C.'s, and A.C.'s father's ("Father 1") stipulation to the agency's request for permanent custody; the case was remanded to the trial court. *In re A.C.,* 8th Dist. Cuyahoga No. 102351, 2015-Ohio-3673.

**{¶4}** In September 2014, Mother gave birth to J.S. with Father 2. The agency filed a complaint alleging the child was dependent and requesting permanent custody of the child. The case for the older three children, which, as mentioned, was remanded by this court, and the new case were consolidated for the purposes of a new permanent

custody trial. Maternal grandmother moved for legal custody of the three older children, but not for J.S.

**{¶5}** The matter proceeded to trial in October 2016.

**{¶6}** CCDCFS social worker Mi-Lin Tate ("Tate") testified that she had been the family's caseworker for almost two years. Mother's three older children had been out of her care and custody for over five years. The youngest child had been out of Mother's care and custody his entire life except for the first two days. Tate testified that the agency remained committed to working toward reunification, which was the permanency plan. Mother's case plan included mental health, parenting, domestic violence services, and meeting the children's basic needs. Tate testified that basic needs was on Mother's case plan to ensure she could meet the children's needs given her history of inconsistent housing. Tate noted that Mother most recently lived with Father 2, but ended her relationship with Father 2 just before trial and moved out. Mother was currently living with relatives and did not have adequate housing for four children; thus, she lacked stable housing.

**{¶7}** Tate testified that when visitations were scheduled weekly, Mother would attend about fifty percent of the time. Eventually, due to Mother's inconsistency and the children's poor reaction to the visits, the visits were reduced to every other week. Tate testified that B.B. attends counseling to address her anger management and coping skills and receives special education services at school.

{¶8} Dr. Amy Justice conducted Mother's psychological evaluation; she also testified at trial. According to the results, Mother scored extremely low in terms of intellectual function and was functionally illiterate. Dr. Justice reviewed Mother's mental health records and was concerned about her lack of consistency in mental health treatment, opining that a lack of consistency inhibited Mother's progress. Dr. Justice was also concerned that Mother lacked comprehension with regard to why she did not have custody of her children — Mother told the doctor that the three older children were originally removed from her because they were biracial. Dr. Justice pointed out that Mother's inability to understand why her children were originally removed from her was a concern because it was unlikely Mother could remedy the causes of removal if she still could not recognize what the causes were.

{¶9} Dr. Justice recommended a number of services for Mother. The doctor recommended domestic violence services because Mother remained in abusive relationships and failed to understand that her most recent relationship was violent. Dr. Justice also recommended sleep practice services because Mother slept during the day and was awake at night, which was not conducive to raising children. Finally, Dr. Justice opined that no service could rectify Mother's intellectual deficits.

{¶10} Mother's counselor at Recovery Resources testified that she was involved with Mother for the ten months prior to trial. The counselor testified that she worked with Mother on her anger issues and mental health diagnoses. The counselor noted that Mother struggled with consistency in attending appointments, and had failed to show up

to appointments for the last two months. The counselor felt Mother had made some progress but any gains were inhibited by Mother's inconsistency and Mother was in danger of being terminated from services due to her failure to attend her appointments.

{¶11} The foster father testified that at the time the children came into custody B.B. was having seizures, B.B. and C.C. had head lice, and A.C. was malnourished and underweight. The children left foster care and were placed with a relative but returned to foster care in 2013. When the children returned to the foster home, all three had head lice. Since living with their foster family, B.B.'s seizures had stopped and the children had no major health issues.

{¶12} According to the foster father, the children reacted poorly to the visits with Mother. B.B. displayed anger and poor behavior around visitation time, but these problems got better when the visits were reduced to every other week. C.C. was much happier after the reduction in visits and told her foster father that she just "wants it to be done and over with."

{¶13} CCDCFS social worker Venita Wiggins ("Wiggins") testified that she was the previous social worker assigned to the family, and worked with the family for a couple of years. During her time working with the family, Wiggins had regular contact with maternal grandmother. Wiggins testified that based on her involvement with maternal grandmother, she would not support granting legal custody to maternal grandmother because it would not be in the children's best interest. Wiggins expressed

concern that grandmother had neglected her own children, including Mother, and that grandmother's previous home was unsanitary and unsafe.

{¶14} Maternal grandmother testified that she was seeking legal custody of the older three children and was aware the children would be separated from their youngest sibling if she was granted legal custody. Maternal grandmother admitted she had neglected Mother and her other children when they were young. Grandmother thought the juvenile court should grant custody of the four children to Mother because Mother could care for her children but that she would take legal custody of three of the children if the court did not grant custody to Mother.

{¶15} The Guardian Ad Litem ("GAL") for the children recommended the trial court grant permanent custody to the agency. The GAL noted that the foster family provided for the children's needs, live in a child-centered home, and the children were "very happy" with their foster family. She opined that neither the parents nor maternal grandmother could provide for the children. She stated that Mother had "no stability. She doesn't have stability of a relationship. She doesn't have stability of housing. She doesn't have the ability to properly parent. She doesn't have the insight into what her children's needs are." The GAL noted that neither the fathers nor the maternal grandmother could provide appropriately for the children.

{¶16} The juvenile court granted the agency's motion for permanent custody. Mother filed a notice of appeal. Father 1 and Father 2 are appealing the termination of their parental rights concerning their respective children. *See In Re A.C.*, 8th Dist.

Cuyahoga No. 105336 (Father 1) and *In Re J.S.*, 8th Dist. Cuyahoga No. 105344 (Father 2).

{¶17} Following oral argument in this matter, the parties were ordered, sua sponte, to brief the issue whether the trial court complied with 25 U.S.C. 1912 and this court's holding in *In Re: R.G.*, 8th Dist. Cuyahoga 104434, 2016-Ohio-7897, with regard a trial court's duty to inquire about a parent's Native American ancestry. Post-briefing, this court remanded the case to the trial court to hold a hearing for the limited purpose of complying with this court's decision in *In Re: R.G.* The trial court complied with our limited remand and issued a

journal entry finding that no Native American ancestry had been established.

{¶18} Mother raises one assignment of error for our review:

I. The judgment terminating Appellant's parental rights and awarding permanent custody to the agency is against the manifest weight of the evidence.

{¶19} In her sole assignment of error, Mother argues that the trial court's decision to grant permanent custody of her children to CCDCFS was against the manifest weight of the evidence.

**Permanent Custody**

{¶20} An agency may request permanent custody of a child as part of its original abuse, neglect, or dependency complaint. R.C. 2151.353(A)(4). A juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence "if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence." *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16.

{¶21} When granting permanent custody pursuant to R.C. 2151.353, a trial court must make two determinations. The court must first find that "the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent" in accordance with R.C. 2151.414(E). The court must also find that permanent custody is in the best interest of the child pursuant to R.C. 2151.414(D).

**Placement with Mother**

{¶22} Mother argues that the trial court's determination that the children could not be placed with her within a reasonable time is against the manifest weight of the evidence.

{¶23} As stated, to determine whether a child cannot or should not be placed with a parent within a reasonable time, courts look to the factors set forth in R.C. 2151.414(E). If a court determines by clear and convincing evidence that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *Id.* A trial court need only find that one of the factors set forth in R.C. 2151.414(E) is met in order to properly find that a child cannot or should not be placed with a parent. *In re Baby Boy M*, 8th Dist. Cuyahoga No. 91312, 2008-Ohio-5271, ¶ 29-31.

**{¶24}** "Clear and convincing evidence" is that measure or degree of proof that is more than a "preponderance of the evidence," but does not rise to the level of certainty required by the "beyond a reasonable doubt" standard in criminal cases. *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 8. It "produces in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Id.* In determining whether a juvenile court based its decision on clear and convincing evidence, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the degree of proof. *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 24, citing *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990).

**{¶25}** In this case, as it relates to Mother, the juvenile court found that the factors set forth in R.C. 2151.414(E)(1), (2), and (4) applied and (11) applied to Father 1. As the court explained:

> Pursuant to R.C. 2151.414(E), the Court finds by clear and convincing evidence that the minor child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent due to one or more of the following factors:
>
> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parents have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.
>
> * * *

(2)   Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year.

* * *

(4) The parents have shown a lack of commitment toward the child.

* * *

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section * * * .

{¶26} To support its finding under subsection (1), the trial court found that Mother failed to benefit from case plan services including mental health services and basic needs. The court stated that Mother failed to consistently attend appointments with mental health service providers.

{¶27} Under (2), the trial court found that the parents had been diagnosed with chronic mental and emotional illness that prevent them from providing an adequate permanent home for the children.

{¶28} Under (4), the trial court found that the parents had demonstrated a commitment to the children by visiting but had failed to financially support the children, have not had suitable housing or employment, and therefore, cannot meet the basic needs of the children.

{¶29} Under (11), the trial court found that Father 1 and Father 2 had previously had their parental rights involuntarily terminated as to other children.

**{¶30}** We find competent, credible evidence in the record to support the trial court's findings. Mother's social worker testified that by the time of the permanent custody trial, Mother had failed to remedy the conditions that caused the removal of her children. Mother no longer had stable housing, was living with relatives, and did not have appropriate housing for the children. Mother's counselor at Recovery Resources testified that she had been involved with Mother for ten months and while Mother had made some progress on her goals, her progress was inhibited by her inconsistent attendance at appointments and she was in danger of being terminated from the program.

**{¶31}** Mother was reevaluated by Dr. Justice prior to trial and Dr. Justice opined that Mother had not sufficiently benefitted from services. Dr. Justice recommended additional services for Mother, including one-on-one domestic violence counseling, instead of the group counseling Mother had previously received. Dr. Justice recommended additional domestic violence counseling for Mother because Mother did not understand that she had been in a domestically violent relationship with Father 2; therefore, although Mother had previously attended domestic violence classes, she required more services. Dr. Justice recommended one-on-one counseling for Mother due to Mother's intellectual deficiencies.

**{¶32}** Dr. Justice further testified that Mother scored in the lowest two percent of all people in terms of intellectual function and identified Mother as functionally illiterate. Dr. Justice had concerns about Mother's lack of consistency with mental health treatment and her inability to understand why her children were not in her custody,

including Mother's belief that the agency took the children because they were biracial. Dr. Justice was also concerned about Mother's sleep habits, which included sleeping all day and staying up all night and recommended sleep practice services.

{¶33} The family's social worker, Tate, testified that Mother attended visits about half of the time when they were scheduled weekly. The agency reduced the visits to twice a month based on Mother's inconsistency and the children's poor reaction to visits.

{¶34} In light of the above, we find clear and convincing evidence in the record to support the juvenile court's findings under R.C. 2151.414(E).

**Best Interests of the Children**

{¶35} R.C. 2151.414(D)(1) further requires that

[i]n determining whether permanent custody is in the best interest of the child, the juvenile court must consider "all relevant factors," including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶36}** The juvenile court has considerable discretion in weighing these factors. *In re J.H.*, 8th Dist. Cuyahoga No. 105078, 2017-Ohio-7070, ¶ 53. The best interest determination focuses on the child, not the parent. *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 59, citing *In the Matter of: Austin Mayle*, 8th Dist. Cuyahoga Nos. 76739 and 77165, 2000 Ohio App. LEXIS 3379 (2000). Although the juvenile court is required to consider each factor listed in R.C. 2151.414(D)(1), no one factor is given greater weight than the others pursuant to the statute. *In re T.H.*, 8th Dist. Cuyahoga No. 100852, 2014-Ohio-2985, ¶ 23, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532.

**{¶37}** Mother argues that the trial court's decision to grant permanent custody of the oldest three children was against the manifest weight of the evidence because the maternal grandmother could have taken legal custody of the children. As Mother noted in her brief on appeal, while consideration of whether the children can be placed with a relative is not required by the statute, courts have held that the possibility of placement with a relative "'is a matter that ought to be considered in connection with the child's interaction and relationship with the child's parents, relatives, foster caregivers, out-of-home providers, and any other person who may significantly affect the child.'"

*In re S.F.*, 2d Dist. Montgomery No. 25318, 2013-Ohio-508, ¶ 23, quoting *In re F.C.*, 2d Dist. Montgomery No. 23803, 2010-Ohio-3113, ¶ 24.

{¶38} The record shows that the agency investigated maternal grandmother as a possible placement; however, she did not file for legal custody of J.S. and the agency was concerned with separating the siblings from one another. Maternal grandmother also admitted that she had neglected her own two children and the first removal of Mother's three oldest children happened when they were living with maternal grandmother.

{¶39} The agency also had issues with maternal grandmother's housing. Maternal grandmother had recently moved out of state and, although her new house had been deemed appropriate, she had lived in three different places in the ten months prior to trial. Maternal grandmother also has legal custody of three other grandchildren and both the agency and the GAL were concerned whether grandmother could handle additional grandchildren. Finally, maternal grandmother testified that she believed that Mother should have custody of the children and only filed for legal custody in case the court did not grant custody to Mother. Maternal grandmother testified she fully believed Mother could care for the children even though the children had not been in Mother's care or custody for over five years.

{¶40} The children had been placed with the same foster family the entire time, except for the 14-month period where the three oldest children were committed to the custody of a relative, and the foster family wished to adopt the children. The GAL

testified that the children appeared more comfortable and bonded with their foster parents than their biological parents.

**{¶41}** Next, Mother argues that the trial court erred in that it did not take the wishes of eight-year-old B.B. and seven-year-old C.C. into account when considering custody, contrary to R.C. 2151.414(D)(1)(b). But R.C. 2151.414(D)(1)(b) also involves the child's wishes as expressed by the child's GAL. The GAL testified that the children had negative reactions to visitation with their Mother but were bonded to their foster family. B.B. displayed issues with anger and behavior when visits occurred, but these problems reduced when the visits were reduced and C.C. appeared to be happier after the reduction in visits and told the foster father that she "just wants it to be done and over with." As to the wishes of children ages seven and eight years old, the statute requires the court to take "due regard for the maturity of the child" and the trial court expressly stated it considered the wishes of the minor child as stated by the GAL, "though the court has considered the age of the child."

**{¶42}** Based on the facts in the record, we find clear and convincing evidence in the record to support the juvenile court's findings under R.C. 2151.414(D).

**Agency Made Reasonable Efforts**

**{¶43}** Next, Mother contends that CCDCFS failed to make reasonable efforts to reunite her with her children.

**{¶44}** R.C. 2151.419 provides:

[A]t any hearing * * * at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency * * * that filed the complaint in the case, removed the child from home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home.   The agency shall have the burden of proving that it has made those reasonable efforts.

**{¶45}** Mother argues that CCDCFS should have offered her more services, services at an earlier date, and more follow-through on her services.   Whether an agency, however, made reasonable efforts pursuant to R.C. 2151.419 is based on the circumstances of each case, not whether there was anything more the agency could have done.   *See In re K.M.S.*, 3d Dist. Marion Nos. 9-15-37, 9-15-38, 9-15-39, 2017-Ohio-1412, ¶ 68.

**{¶46}** When this case commenced in 2013, Mother's older children had already been removed from her care and custody.   The social worker, Tate, testified that Mother's case plan requirements included mental health, parenting and domestic violence classes, and meeting the children's basic needs.   Tate testified that Mother had been referred by previous caseworkers for parenting, and domestic violence services and she referred Mother to Recovery Resources to address her mental health.   Mother's

Recovery Resources counselor testified that while Mother was making some progress, she had failed to show up for two months of appointments and was in danger of being terminated from the program.

{¶47} The trial court recognized that Mother had transportation issues, which may have prevented her from keeping some of her appointments at Recovery Resources, but the court also noted that Mother should have informed her social worker so the social worker could assist Mother with securing free transportation.

{¶48} Mother also contends that she was prejudiced by having a psychological evaluation done just prior to trial. The record shows, however, that Mother's evaluation with Dr. Justice was not her first evaluation — Mother was previously evaluated by the Juvenile Court Diagnostic Clinic and referred for services. Moreover, Mother's initial psychological evaluation appointment was scheduled several months prior to trial, but Mother missed that appointment. Dr. Justice testified that had Mother not missed the appointment, she would have had her report completed and there would have been "three months or so to implement whatever recommendations there were before trial[.]"

{¶49} Mother also contends that the agency did not make reasonable efforts as to the children's fathers and maternal grandmother. But, as mentioned, both fathers appealed and could have raised that on appeal. The juvenile court denied maternal grandmother's motion for legal custody and maternal grandmother did not appeal the court's ruling.

**{¶50}** Therefore, the trial court's finding that the agency made reasonable efforts to prevent the removal or continued removal of the children was supported by competent, credible evidence in the record.

**Guardian Ad Litem**

**{¶51}** Mother argues that the there were multiple omissions in the GAL's investigation that call into question the thoroughness of her investigation and reliability of her report and recommendation. Specifically, Mother claims that the GAL failed to observe Father 2's interaction with J.S. or conduct a home visit at Father 2's house, did not conduct a home visit at maternal grandmother's house, and did not interview the children's previous GAL.

**{¶52}** The record belies her claims. The GAL attended multiple visitations with J.S. but Father 2 failed to show up at the visits that the GAL attended. The GAL also visited Father 2's house and maternal grandmother's house before maternal grandmother relocated out of state. Finally, the GAL testified that she spoke with the GAL assigned to the case that immediately preceded her.

**{¶53}** The record shows that the GAL's investigation included reviewing the court file, case file, discovery, reports, and court orders. The GAL testified that she visited the homes of Mother, Father 1, and Father 2. She interviewed the parents, maternal grandmother, maternal uncle, social workers, foster parents, the parents' attorneys, the children's attorneys, service providers, and school personnel. She also interviewed the children in their foster placement and at a visitation with their family. Finally, the GAL

prepared a thorough report and recommendation, attended multiple hearings, and testified at trial.

**{¶54}** There is nothing in the record that suggests that Mother was prejudiced by the GAL's investigation or report and recommendation.

**{¶55}** The juvenile court's decision was supported by competent, credible evidence in the record and was not against the manifest weight of the evidence. Accordingly, the court did not err by granting permanent custody of the children to CCDCFS and Mother's sole assignment of error is overruled.

**{¶56}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

_____
LARRY A. JONES, SR., JUDGE

PATRICIA ANN BLACKMON, J., CONCURS;
EILEEN A. GALLAGHER, A.J., CONCURS
WITH SEPARATE OPINION

EILEEN A. GALLAGHER, A.J., CONCURRING WITH SEPARATE OPINION:

{¶57} I concur with the opinion of my learned colleagues but feel compelled to write separately regarding my concerns about the suitability of the current foster care placement.

{¶58} The evidence in this case is scant as to the living conditions in the foster home. There was testimony that now living in the home are foster mother, foster father, A.C., B.B., C.C. and J.S. III (the minors subject to the current litigation and companion cases now before this court.)

{¶59} In addition to those six people, testimony reflects that there are an unspecified number of tenants in the home whose identity was not revealed and there is no testimony as to the backgrounds of these persons.

{¶60} In addition, there are numerous animals in the home as well as a suggestion that there are also two adult, biological children of the foster parents in the home and, again there is no testimony as to their backgrounds.

{¶61} There was no testimony offered that these other persons, i.e. tenants and adult biological children have been investigated as to mental health issues, substance abuse issues or criminal records.

{¶62} In addition, the record reflects that there are one and half bathrooms in the foster home that are used by up to nine adults and the four children.

{¶63} For those reasons, although I agree to the permanent custody being awarded to Cuyahoga County Division of Children and Family Services, I believe that the current placement be investigated.